**IN THE UNITED STATES DISTRICT COURT**
**NORTHER DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| 1501 BUSCH PARKWAY LLC; SKY FITNESS CORPORATION; SKY EQUIPMENT CORPORATION; SKY GLOBAL LLC; and SKY CAFÉ dba SKY SPA & LOUNGE a/k/a SKY FITNESS CAFE INC dba SKY SPA & SAUNA, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| vs. | Case No. |
| THE CINCINNATI INSURANCE COMPANY, a stock insurance company, | |
| Defendant. | |

**PLAINTIFFS' COMPLAINT AT LAW**

Now Come Plaintiffs, 1501 BUSCH PARKWAY LLC, SKY FITNESS CORPORATION, SKY EQUIPMENT CORPORATION, SKY GLOBAL LLC, and SKY CAFÉ dba SKY SPA & LOUNGE a/k/a SKY FITNESS CAFE INC dba SKY SPA & SAUNA, (hereinafter "Plaintiffs"), by and through their attorneys, for their causes of action against Defendant THE CINCINNATI INSURANCE COMPANY (hereinafter "Defendant" or "Cincinnati"), a stock insurance company; and state and allege as follows:

**INTRODUCTION**

1.      This matter arises over the dispute of insurance coverage resulting from a natural disaster, which is the COVID-19 pandemic (hereinafter, "COVID-19", "pandemic", or "COVID-19 pandemic"). Plaintiffs sought and obtained coverage from Defendant to cover a myriad of risks for all aspects of its business operations, including, but not limited to, liability, property damage, property loss, and business income.

2.      Plaintiffs purchased property casualty insurance from Defendant for the purpose of transferring its risk and its exposure from sudden catastrophic loss and to reduce financial

uncertainty which make accidental loss manageable which allows it to enable its owners, suppliers, investors and creditors to have confidence in its continuing operations and viability.

3.     Plaintiffs assert claims for physical loss or damage resulting in business interruption. Under longstanding principles of insurance law, Plaintiffs are entitled to payment under its insurance policy from Defendant for physical loss or damage it suffered. Specifically, the pandemic caused direct physical loss of or damage to Plaintiffs' operations by physically impairing, detrimentally altering, rendering them nonfunctional, and by depriving them of the ability to function and operate. The threshold legal question Plaintiffs come to this Court with is whether Defendant Insurers must provide coverage under an all-risk commercial insurance policy for direct physical loss and/or damage caused by the pandemic, which has physically impaired, detrimentally altered, and rendered Plaintiffs' operations and properties nonfunctional.

4.     Prior to the pandemic, Plaintiffs' establishments were bustling and set to expand. Its fitness center was a place where people congregated and worked out. Its spa and lounge, a newly built structure, was set to open and operate.

5.     The pandemic brought an end to all of that activity by imposing direct physical restrictions that impaired Plaintiffs' operations and properties and rendered them nonfunctional for their intended purposes. The equipment, machines, café and the studios were off-limits. The fitness classes were cancelled. The physical premises of each of its establishments, including their appearance, shape, physical layout, and the physically demarcated routes for customer traffic – all of which are critical to its operations – were materially and detrimentally altered. Vast amounts of square footage in its properties – many painstakingly designed to maximize the customer's experience and the establishment's revenue – were lost and rendered nonfunctional for their intended purposes. Plaintiffs' business operations were directly and physically altered to a material degree, in that no customers, employees, suppliers, or humans were allowed to occupy the interior of the fitness center, the spa, the lounge, or the café as would be the normal function.

6.     Plaintiffs reasonably believed and expected that the pandemic was among the risks covered under its insurance policy with Defendant.

7.    Accordingly, Plaintiffs seek an award of damages pursuant to terms under its insurance policy with Defendants, for the loss and damage caused to Plaintiffs because of the pandemic.

## PARTIES

8.    Plaintiff SKY FITNESS CORPORATION is an Illinois Limited Liability Company with its principal place of business at 1501 Busch Parkway, Buffalo Grove, Illinois 60089.

9.    Plaintiff 1501 BUSCH PARKWAY LLC is an Illinois Limited Liability Company with its principal place of business at 1501 Busch Parkway, Buffalo Grove, Illinois 60089.

10.    Plaintiff SKY EQUIPMENT CORPORATION is an Illinois Limited Liability Company with its principal place of business at 1501 Busch Parkway, Buffalo Grove, Illinois 60089.

11.    Plaintiff SKY GLOBAL LLC is an Illinois Limited Liability Company with its principal place of business at 1501 Busch Parkway, Buffalo Grove, Illinois 60089.

12.    Plaintiff SKY CAFÉ DBA SKY SPA & LOUNGE a/k/a SKY FITNESS CAFE INC dba SKY SPA & SAUNA, is an Illinois Limited Liability Company with its principal place of business at 1501 Busch Parkway, Buffalo Grove, Illinois 60089.

13.    1501 BUSCH PARKWAY LLC, SKY FITNESS CORPORATION, SKY EQUIPMENT CORPORATION, SKY GLOBAL LLC, and SKY CAFÉ DBA SKY SPA & LOUNGE a/k/a SKY FITNESS CAFE INC dba SKY SPA & SAUNA, referred to hereinafter as ("Plaintiffs.")

14.    Defendant THE CINCINNATI INSURANCE COMPANY, is a stock insurance company organized under the laws of the State of Ohio with its principal place of business located at 6200 S. Gilmore Road, Fairfield, Ohio 45014-5141.  At all times relevant Defendant was licensed to do business in the State of Illinois, selling property and casualty insurance policies to bars, restaurants, fitness centers, and other hospitality businesses. Defendant is transacting the business of insurance in the state of Illinois and the basis of this suit arises out of such conduct.

15.     Defendant subscribed to Policy Number ETD 036 06 42 ("Policy") and issued the Policy for Plaintiffs' property and business for the period of November 5, 2019 through November 5, 2020.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), as there exists complete diversity of citizenship between the parties, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over Cincinnati Insurance pursuant to Illinois' long-arm statute, 735 ILCS 5/2-209, because this Complaint concerns: (1) one or more contracts Cincinnati made to insure property and/or risk in Illinois, (2) business that Cincinnati transacted within Illinois, and (3) one or more contracts and/or promises Cincinnati made that are substantially connected with Illinois. 735 ILCS 5/2-209(a)(1), (4), (7). In addition, Cincinnati Insurance exercises systematic and continuous contacts with Illinois by doing business in Illinois, serving insureds in Illinois, and seeking additional business in Illinois.

18.     Venue is proper in the United States District Court for the Northern District of Illinois, Eastern Division pursuant to 28 U.S.C. § 1391 because "a substantial part of the events or omissions giving rise to the claim[s] occurred" in this District and a substantial part of the property that is subject to this action is situated in this District.

## FACTUAL BACKGROUND

19.     On or around November 5, 2019, Defendant entered into a contract of insurance with Plaintiffs in the event of a covered loss or damage. The policy issued by Defendant was a Property Insurance Policy covering Plaintiffs' business operations and property. The contract of insurance or policy issued by Defendant to Plaintiffs has policy number ETD 036 06 42 (hereinafter "Policy"). A true and correct copy of the Policy is attached hereto as **Exhibit 1**.

20.     The named insureds under the Policy are 1501 Busch Parkway LLC, Sky Fitness Corporation, Sky Equipment Corporation, Sky Global LLC, and Sky Café dba Sky Spa & Lounge.

21.     Under the Policy, Plaintiffs agreed to make payments to Defendant in exchange for Defendant's promise to indemnify Plaintiffs for losses including, but not limited to, business income losses at the insured property including the premises located at 1501 Busch Parkway, Buffalo Grove, Illinois 60089, (hereinafter "Insured Property.")

22.     The Policy was in full effect, providing property, business personal property, business income and extra expense, and additional coverages between the period of November 5, 2019 through November 5, 2020.

23.     The Businessowners Special Property Coverage Form of The Policy provides, in part, the following as shown in Exhibit 1 and Image 1 below:

**(1) Business Income**

We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss. With respect to "loss" to personal property in the open or personal property in a vehicle or portable storage unit, the "premises" include the area within 1,000 feet of the building or 1,000 feet of the "premises", whichever is greater.

*Image 1*

24.     The Businessowners Special Property Coverage Form of The Policy also provides, in part, the following as to Extra Expense as shown in Exhibit 1 and Image 2 on the following page:

5

**(2) Extra Expense**

> **(a)** We will pay Extra Expense you sustain during the "period of restoration". Extra Expense means necessary expenses you sustain (as described in Paragraphs **(2)(b), (c)** and **(d)**) during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

*Image 2*

25.     The Policy applies to the actual loss of business income sustained and necessary extra expenses incurred when the operations of the business is suspended due to the direct physical loss of or damage to the Insured Premises that is not excluded.

26.     The Policy also includes Civil Authority additional coverage as shown in Exhibit 1 and in part in Image 3 on the following page:

**(3) Civil Authority**

When a Covered Cause of Loss causes damage to property other than Covered Property at a "premises", we will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:

**(a)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and

**(b)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

This Civil Authority coverage for "Business Income" will begin immediately after the time of that action and will apply for a period of up to 30 days from the date of that action.

This Civil Authority coverage for Extra Expense will begin immediately after the time of that action and will end:

**1)** 30 consecutive days after the time of that action; or

**2)** When your "Business Income" coverage ends;

whichever is later.

*Image 3*

27.     Plaintiffs faithfully paid policy premiums to Defendant to specifically provide all risk coverage, including the actual loss of business income due to the necessary interruption of business operations due to direct physical loss of or direct physical damage to property as well as a civil authority prohibition.

28.     Pursuant to the terms of the Policy, Defendant agreed to pay for direct physical loss of or damage to the Insured Property caused by or resulting from any covered cause of loss.

29.     Plaintiffs' reasonable expectation is that its Insured Property would be covered due to physical damage or loss of ability to operate its property as defined under its Policy.

30.     An world pandemic has occurred. A novel coronavirus, known as COVID-19, began infecting humans in China in December 2019.

31.     The COVID-19 pandemic got to Illinois in January 2020 as more particularly set forth below. According to the Center for Disease Control ("CDC"), from January 21, through February 23, 2020, 14 U.S. cases of COVID-19, all related to travel from China, were detected by public health agencies.[1] According to Illinois Department of Public Health, the first confirmed case of COVID-19 in Illinois was on January 24, 2020.[2] The World Health Organization ("WHO") announced March 11, 2020 that the spread of coronavirus qualifies as a global pandemic.[3] By April 27, 2020, Illinois had 45,883 confirmed COVID-19 positive cases and 1,983 deaths due to the virus. On August 27, 2020, Illinois was reported to have 227,334 confirmed COVID-19 positive and 7,977 COVID-19 deaths since the start of the pandemic. By October 27, 2020, those numbers rose to 382,985 and 9,568, respectively.[4] And the numbers continue to spike. Further, effective November 20, 2020, stricter guidelines were imposed to combat this pandemic.[5]

---

[1] California Department of Public Health, *State Officials Announce Latest COVID-19 Facts,* (March 27, 2020), https://www.cdph.ca.gov/Programs/OPA/Pages/NR20-035.aspx (last visited Apr. 21, 2021).

[2] Illinois Department of Public Health, *Chicago Announces First Local Patient with Travel-Related Case of 2019-Novel Coronavirus*, http://www.dph.illinois.gov/news/city-chicago-announces-first-local-patient-travel-related-case-2019-novel-coronavirus (last visited Apr. 21, 2021)

[3] World Health Organization, *WHO Director-General's Opening Remarks At The Media Briefing on COVID-19,* (Jan. 24, 2020), *https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020* (last visited Apr. 21, 2021).

[4] Caroline Hurley, *Latest Illinois Coronavirus Cases and Deaths*, Chicago Sun Times, (Dec. 13, 2020), https://chicago.suntimes.com/essential-coronavirus-news/2020/3/27/21197312/illinois-coronavirus-cases-by-day-deaths-graph-live-updates (last visited Apr. 21, 2021).

[5] State of Illinois Coronavirus Response, *Actions to Combat a Resurgence of COVID-*19, https://coronavirus.illinois.gov/s/restore-illinois-mitigation-plan (last visited Apr. 21, 2021).

32.     The existence and/or presence of COVID-19 is not simply reflected in reported cases or individuals' positive test results, which necessarily underestimate the number of cases because only a portion of the population gets tested. The CDC estimates that the number of people in the United States who have been infected with COVID-19 was ten times higher than the number of reported cases in June 2020.[6]  Studies have demonstrated that pre-symptomatic individuals have an even greater ability to transmit COVID-19 than other infected people because they carry high levels of "viral load" during a period when they have no symptoms and therefore are unaware that they are infectious.[7] COVID-19 also includes a pre-symptomatic incubation period of up to 14 days, during which time infected people can transmit COVID-19 to people, release infectious droplets and aerosols into the air and onto surfaces without having experienced symptoms and without realizing they are contagious or infected.[8]

33.     COVID-19 is highly contagious and potentially deadly. The degree to which an infectious disease is contagious is measured by $R_0$, a term that defines the average number of people who are likely to become infected by one person with that disease. The $R_0$ is a measure of the transmissibility of a pathogen and is determined by estimating the susceptibility of individuals in the population to disease, the transmissibility of the pathogen and importantly, the likelihood and duration of contact between individuals in a population, a parameter that is directly determined

---

[6] Lena H. Sun & Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported,* Washington Post (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/ (last visited Apr. 21, 2021).

[7] See, e.g., Xi He et al., *Temporal dynamics in viral shedding and transmissibility of COVID-19*, 26 Nature Med. 672, 674 (Apr. 15, 2020), https://www.nature.com/articles/s41591-020-0869-5 (last visited Apr. 21, 2021); Lirong Zou, M.Sc., et al., *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients*, New Eng. J. Med. 382, 1177-79 (Mar. 19, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2001737 (last visited Apr. 21, 2021).

[8] Ellen Cranley, *40% of people infected with covid-19 are asymptomatic, a new CDC estimate says*, Bus. Insider (July 12, 2020), https://www.sciencealert.com/40-of-people-with-covid-19-don-t-have-symptoms-latest-cdc-estimate-says (last visited Apr. 21, 2021).

by the physical properties of the environment in which the contact occurs.[9] Studies have concluded that one person with COVID-19 could infect as many as 5.7 others ($R_0 \approx 5.7$).[10]

34.     By March 11, 2020, COVID-19 was present in property and spaces in the area immediately surrounding the Insured Property, thereby causing physical damage and physical loss. Therefore, it is highly likely that COVID-19 has been present on the premises of the Insured Property, thus damaging the Insured Property. The demonstration of even the likely presence of COVID-19 at the Insured Property is sufficient to render the property unfit, unsafe or uninhabitable for normal use and to negatively affect the property's usability. The presence of COVID-19 directly results in the loss of use of that property.

35.     The omnipresence of COVID-19 is enabled by multiple modes of viral transmission, including respiratory droplet, airborne/aerosolized and fomite transmission (i.e., transmission from surfaces and objects).[11] COVID-19 spreads through infected droplets that are physical objects that attach to and cause harm to other objects based on its ability to survive on surfaces and infect other people.

36.     Due to the prevalence (ratio of infected persons in a population) and incidence (ratio of new cases) of COVID-19 infections in Illinois, Plaintiffs would have had consistently high risks for the presence of COVID-19 from infected patrons and employees, some of whom would have been asymptomatic and unknowing spreaders (in some cases super spreaders) of COVID-19. COVID-19 can be released into the air when infected persons breathe, talk, cough, sneeze, or yell and such releases can infiltrate ventilation systems, as well as myriad surfaces such as any and all

---

[9] Anthony R. Ives & Claudio Bozzuto, *Estimating and explaining the spread of COVID-19 at the county level in the USA*, 4 Commc'ns Biology 60 (Jan. 20, 2021), https://www.nature.com/articles/s42003-020-01609-6 (last visited Apr. 21, 2021).

[10] M. Cevik, C.C.G. Bamford & A. Ho, *COVID-19 pandemic-a focused review for clinicians*, 26 Clinical Microbiology and Infection 7, 842-47 (July 1, 2020), https://www.clinicalmicrobiologyandinfection.com/article/S1198-743X(20)30231-7/fulltext (last visited Apr. 21, 2021).

[11] *See, e.g., Transmission of SARS-CoV-2: implications for infection prevention precautions,* WHO (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Apr. 21, 2021).

dermal contact surfaces (e.g., fixtures, door handles, work-out machines, free weights). This can pose transmission risks for persons contacting surfaces that have been transformed into disease-spreading fomite: physical objects or materials that carry and are capable of transmitting infectious agents, altering the objects to become vectors of disease.[12]

37.    The presence of COVID-19 in the air and on surfaces has caused direct physical loss of or damage to property and made Plaintiffs' businesses uninhabitable, unsafe and unfit for their intended uses. The WHO's description of fomite transmission of COVID-19 expressly recognizes physical alteration of property, describing viral droplets as "*creating* fomites (contaminated surfaces)" (emphasis added).[13]

38.    Unlike surface cleaning of visible substances like dust or debris, where the degree of "clean" may be visually confirmed to a reasonable degree of certainty, that is not the case for the cleaning and disinfection of COVID-19 because COVID-19 is not visible to the naked eye and the degree and magnitude of COVID-19 would be unknown so the rigorousness required and effectiveness of disinfection cannot be determined. In fact, the CDC has recently released guidance stating that there is little evidence to suggest that routine use of disinfectants can prevent the transmission of the Coronavirus from fomites.[14]

39.    No amount of routine surface cleaning could remove the aerosolized COVID-19 suspended in the air, making that air dangerous and rendering them uninhabitable, unsafe and unfit for their intended uses. For example, the CDC published a research letter concluding that a

---

[12] Jing Cai et al., *Indirect Virus Transmission in Cluster of COVID-19 Cases*, Wenzhou, China, 2020, 26 Emerging Infectious Diseases 6 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited Apr. 21, 2021).

[13] *See, e.g., Transmission of SARS-CoV-2: implications for infection prevention precautions,* WHO (Jul. 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited Apr. 21, 2021).

[14] *Science Brief: SARS-CoV-2 and Surface (Fomite) Transmission for Indoor Community Environments*, CDC (updated Apr. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/science-and-research/surface-transmission.html  (last visited Apr. 21, 2021).

restaurant's air conditioning system triggered the transmission of COVID-19, spreading it to people who sat at separate tables downstream of the restaurant's airflow.[15]

40.     Occupancy of indoor spaces is reported to be a major risk factor for transmission of COVID-19. Investigation of over 7,000 COVID-19 cases found that all outbreaks involving three or more people occurred indoors.[16]

41.     The presence of COVID-19 on property, including in indoor air, on surfaces, and on objects, renders the property lost, unsafe and unfit for its normal usage. Respiratory particles (including droplets and airborne aerosols) and fomites are physical substances that alter the physical properties of the interiors of buildings to make them unsafe, untenantable and uninhabitable.

42.     The pandemic is a natural disaster. The business loss caused by the pandemic is indistinguishable from those caused by other natural disasters like earthquakes, hurricanes, and fires. Plaintiffs' policy was intended to provide coverage for loss and damage resulting from natural disasters such as the pandemic.

43.     Plaintiffs have sustained direct, physical loss and/or damage to its Insured Property. Specifically, all of the equipment, spaces, fitness classes, and tables were rendered nonfunctional because Plaintiffs were required to make substantial detrimental physical alterations and tangible damage to its premises. Additionally, Plaintiffs' operations were inexorably altered, in that patrons were no longer able to physically occupy the interior of Plaintiffs' fitness center and café operations were completely lost, employees were lost, and suppliers were lost.

---

[15] Jianyun Lu et al., *COVID-19 outbreak associated with air conditioning in restaurant*, Guangzhou, China, 2020, 26 Emerging Infectious Diseases 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last visited Apr. 21, 2021); *see also* Keun-Sang Kwon et al., *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea,* 35 J. Korean Med. Sci. 46, e415 (Nov. 23, 2020), https://jkms.org/DOIx.php?id=10.3346/jkms.2020.35.e415 (last visited Apr. 21, 2021).

[16] Hua Qian, et al., *Indoor transmission of SARS-CoV-2,* Indoor Air (Oct. 31, 2020), https://pubmed.ncbi.nlm.nih.gov/33131151/ (last visited Apr. 21, 2021).

44.     In order to the protect the public, on March 16, 2020, JB Pritzker, the Governor for the State of Illinois issued Executive Order 2020-07. This Order specifically suspended Plaintiffs' business operations.

45.     In order to further protect the public, on March 20, 2020, JB Pritzker, the Governor for the State of Illinois issued Executive Order 2020-10. This Order specifically ordered that all non-essential businesses, and operations - including Plaintiff's business - must cease all activities.

46.     In an effort to further protect the public, on April 1, 2020, Governor Pritzker issued Executive Order 2020-18, extending the March 20, 2020 Stay at Home order through April 30, 2020.

47.     The above Executive Orders and the orders that followed thereafter prohibited access to the Insured Properties.

48.     It was the public policy intent and intent of each county and state to close businesses including Plaintiffs' for the public good, welfare, and benefit. The Executive Orders were reasonably necessary to protect the public good, welfare, and benefit. The Executive Orders were enacted, in part, due to the physical damage and loss caused by COVID-19.

49.     By March 11, 2020, COVID-19 was present in property and spaces in the area immediately surrounding the Insured Property, thereby causing physical damage and loss. Therefore, it is highly likely that COVID-19 has been present on the premises of the Insured Property, thus damaging the Insured Property.

50.     Plaintiffs have sustained direct, physical loss and damage to its Insured Property. Specifically, all of the equipment, spaces, fitness classes, and tables were rendered nonfunctional because Plaintiffs were required to make substantial detrimental physical alterations and tangible damage to its premises. Additionally, Plaintiffs' operations were inexorably altered, in that patrons were no longer able to physically occupy the interior of Plaintiffs' fitness center and café operations were completely lost, employees were lost, and suppliers were lost.

**SKY FITNESS CORPORATION:**

51.     The following four images depict the Sky Fitness Corporation's open floor with its equipment, as ordinarily operated prior to the loss:









52.    Sky Fitness Corporation suffered direct physical loss evidenced by the distinct, demonstrable, physical alteration of its physical space, the loss of the ability to operate, and patrons themselves. The following four images on the next page depict some of the space after the loss:









53.     Sky Fitness Corporation membership is at a steady decline and the facility is not being used to its full capacity.

**SKY CAFÉ DBA SKY SPA & LOUNGE**

54.     The following photographs depict the Sky Café dba Sky Spa & Lounge a/k/a Sky Fitness Café Inc. dba Sky Spa & Sauna, open floor with its equipment, as ordinarily operated prior to the loss:





55.     Sky Café dba Sky Spa & Lounge a/k/a Sky Fitness Café Inc. dba Sky Spa & Sauna, suffered direct physical loss evidenced by the distinct, demonstrable, physical alteration of its physical space, the loss of the ability to operate, and patrons themselves. The following photographs depict the space after the loss:





56.     Sky Café dba Sky Spa & Lounge a/k/a Sky Fitness Café Inc. dba Sky Spa & Sauna membership is at a steady decline. Plaintiffs' investment into building the Sky Café dba Sky Spa & Lounge a/k/a Sky Fitness Café Inc. dba Sky Spa & Sauna, has been disrupted by the pandemic closures.

57.     Plaintiffs duly submitted a claim, Number 3552144, to Defendant under the Policy for its loss.

58.     On June 23, 2020, Defendant denied Plaintiffs' claim as not being covered by the Policy. The denial of the claim is attached hereto as **Exhibit 2.**

59.     Although requested to do so, to date, Defendant has and continues to fail and refuse to pay Plaintiffs' for the full amount due and owing under the Policy for all of their losses and damages.

<u>**COUNT I**</u>
<u>**BREACH OF CONTRACT**</u>

60.     Plaintiffs reassert and re-allege paragraphs 1-59 as paragraph 60 of Count I as though fully set forth herein.

61.     Pursuant to the Policy, Defendant has a contractual obligation to fully investigate and adjust the loss, and pay the full amount of Plaintiffs' covered losses, including the actual loss sustained for the necessary interruption of Plaintiffs' business, including, but not limited to, loss of business income and extra expense, less the applicable deductible.

62.     The Policy is an insurance contract under which Defendant was paid premiums in exchange for its promise to pay Plaintiffs' losses for claims covered by the Policy, such as business losses incurred as a result of the Executive Orders forcing Plaintiffs to suspend their business.

63.     Plaintiffs have performed all conditions precedent to their right to recovery under the Policy.

64.     Defendant has refused and continues to refuse to pay for all of the benefits under the Policy including, but not limited to, loss of business income and extra expenses, forcing Plaintiff to litigate.

65.     Defendant's refusal to pay the full amount of Plaintiffs' losses is in breach of the Policy.

66.     Defendant further breached its contract with Plaintiffs by:

a.     failing to fully investigate the loss;

19

b.   conducting a biased and outcome-oriented investigation of the loss;

c.   not promptly paying Plaintiffs all benefits owed as a result of the covered loss;

d.   failing to pay for all consequential damage; and

e.   not putting Plaintiffs in the position they would have been in had Defendant timely performed all of their contractual duties.

67.   As a direct and proximate result of Defendant's breach of contract, Plaintiffs:

a.   suffered and will continue to suffer loss of business income and extra expenses;

b.   incurred and will incur in the future loss of business income and extra expenses;

c.   suffered and will continue to suffer consequential damages;

d.   is entitled to an award of prejudgment interest, taxable costs, and investigatory fees; and

e.   incurred other expenses as a result of Defendant's breach of contract.

## PRAYER FOR RELIEF

Plaintiffs, 1501 BUSCH PARKWAY LLC, SKY FITNESS CORPORATION, SKY EQUIPMENT CORPORATION, SKY GLOBAL LLC, and SKY CAFÉ dba SKY SPA & LOUNGE a/k/a SKY FITNESS CAFÉ INC. DBA SKY SPA & SAUNA, by and through its attorneys, prays that this Court enter judgment in its favor and against Defendant, THE CINCINNATI INSURANCE COMPANY and enter an order:

a.   Awarding actual damages;

b.   Awarding attorney's fees and costs incurred and to be incurred by Plaintiffs for prosecuting this action against Defendant;

c.   Awarding prejudgment and post-judgment interest to Plaintiffs; and

d.   Providing any other such relief as this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial.

DATED: April 22, 2021                    Respectfully submitted,

                                         By: /s/ *Steven A. Hart*
                                         Attorneys for Plaintiffs

                                         HART MCLAUGHLIN & ELDRIDGE, LLC
                                         Steven A. Hart
                                         Robert J. McLaughlin
                                         John (Jack) B. Prior
                                         22 W. Washington Street, Suite 1600
                                         Chicago, Illinois 60602
                                         Tel:    (312) 955-0545
                                         shart@hmelegal.com
                                         rmclaughlin@hmelegal.com
                                         jprior@hmelegal.com

                                         KABATECK LLP
                                         Michael Childress
                                         Brian S. Kabateck (*Pro Hac Vice to be Submitted*)
                                         Christopher Noyes (*Pro Hac Vice to be Submitted*)
                                         Marina R. Pacheco *(Pro Hac Vice to be Submitted)*
                                         633 West Fifth Street, Suite 3200
                                         Los Angeles, California 90071
                                         Tel:    (213) 217-5048
                                         mc@kbklawyers.com
                                         bsk@kbklawyers.com
                                         cn@kbklawyers.com
                                         mp@kbklawyers.com